Second case of the morning, Gillespie Community Unit School District v. Union Pacific Railroad, 4110142, for the appellant, Mr. Berticchio, Mr. Betke, is that the right pronunciation, and for the appellee, Mr. Clear, you may proceed. Good morning. May it please the Court, Thomas Berticchio for the School District appellant. Given the essential identical arguments in the appeals, Your Honor, I will be arguing for both appellants, but as Justice Knecht recognized, Mr. Betke is here for the Illinois Mine Subsidence Insurance Fund. A few facts that override or are important and key to all of the claims, which not only is there no dispute, but no argument about, are important to recognize at the outset. One, Superior Coal, mined coal beneath Bunnells, Illinois, where the School District ultimately built its school. Superior Coal was 100% owned by Chicago and Northwestern. In December 1956, Superior Coal deeded all of its land and mineral rights, estimated to be 150 million tons of unmined coal to Chicago and Northwestern. Several months thereafter, in February of 1957, Superior Coal dissolved. Under Section 94 of the then Business Corporations Act, direct claims against Superior Coal were required to be brought within two years after its dissolution under the Survival Act period as it existed then. Chicago and Northwestern's successor merged with Union Pacific in 1995, with Union Pacific becoming the surviving entity. In March 2009, there was a massive subsidence event in what was one of Superior Coal's mines. As a result, the School District's school was demolished and ultimately condemned. Those facts override all of the claims. Then there are a few overarching legal principles that must be considered at the outset. In Illinois, there is absolute liability for subsidence for the party responsible. That's number one. Number two, the surviving entity in a merger assumes the liabilities of its merger partner as a matter of law. The surviving entity in a merger assumes the liabilities as a matter of law. Thus, in this case, to the extent Chicago and Northwestern had lodged upon it the subsidence liabilities of its subsidiary, Superior Coal, those liabilities were assumed as a matter of law by Union Pacific in 1995 when it merged with Chicago and Northwestern's successor. The School District's amended complaint alleged that Superior Coal's subsidence liability lodged with Chicago and Northwestern because, one, in September of 1956, Chicago and Northwestern assumed the liabilities. Two, in December of 1956, Chicago and Northwestern received all the coal mining assets of Superior Coal in a related entity transfer. Three, there was an alter ego relationship between Chicago and Northwestern and Superior Coal. Four, Chicago and Northwestern directly participated in the mining activities of Superior Coal. The trial court dismissed all of those claims pursuant to Section 2-615 of the Code of Civil Procedure. In doing so, it committed error. Let's first look at the assumption of liabilities claim. Chicago and Northwestern's Board of Directors in September of 1956 passed this resolution. Quote, whereas this company has adopted a policy of reducing the number of subsidiary corporations and in furtherance of that policy, it has determined to be in the best interest of this company that the Superior Coal Company be dissolved, that its assets be transferred to this company, and that this company assume its liabilities. The resolution continues, further resolved that this company assume any liabilities of the Superior Coal Company subject to applicable statutes of limitation that cannot be fully liquidated prior to the time a certificate of dissolution is issued by the Secretary. What does that subject to ethical statute of limitations language mean? Why doesn't it apply here? Well, the trial court ruled that the subject to applicable statute of limitations referred to the Survival Act. And because of that, the trial court concluded that any claim brought past February of 1959 would be barred because Chicago and Northwestern, under that interpretation, was only assuming liabilities under the Survival Act. Why do we know that's wrong? Well, we know it's wrong, first, because nowhere within the resolution is there any expressed reference to the Survival Act. The entire resolution is printed at pages 18 and 19 of our brief, Your Honors. And we can look at it, and we can look at it for a long time. And while there is reference to Section 75 of the then Business Corporations Act concerning with an election to dissolve, there's reference to Section 77 concerning a statement of an intent to dissolve, there's no reference to Section 94. There's no reference in the entire resolution to the Survival Act. So there's no expressed reference. The statute of limitations exists without any end. In other words, if you're saying it's the Survival Act only, it's subject to applicable statute of limitations, I'm not sure what distinction you're drawing here. Well, the reason that the language of statute of limitations is put into the resolution is because statute, again, this is from the clear language, statute of limitations is a matter of law, can be waived. The resolution provides that it is assuming Chicago and Northwestern is assuming all the liabilities subject to the statute of limitations is not being waived. But how do we know that, to address your question, Justice Stegman, that it's not implied, that the Survival Act isn't implied within the statute of limitations? Well, we know that because of Illinois case law. We've cited to the court cases from this state that make clear that the Illinois Survival Act is a separate and distinct act from statute of limitations. The Politon case from the 4th District held and noted that the statutory provision for allowing claims against a dissolved corporation, quote, is a corporate survival statute rather than a statute of limitations. The Canadian Ace Brewing case, the court held, quote, Illinois courts have made clear that Section 94 is a survival statute rather than a statute of limitation. It must be emphasized that the corporate extension statute is not a statute of limitations. The Morris case, quote, Illinois courts have defined their state statute as a corporate survival statute rather than a statute of limitations. Our own Illinois Supreme Court, in the Parker case, relying on authority in this state as far back as 1934, noted that the Survival Act, quote, appears to be a survival statute rather than a statute of limitation. Court after court in this state, as high as the Supreme Court, has told us that these two things are separate and distinct. Now, what does the language in this paragraph mean? What are they intended to mean and how should it be interpreted by this court subject to the applicable statute of limitations? Well, there's three ways, three options on the interpretation. One, it could be interpreted to be unambiguously not assuming the liabilities at issue in this case because it refers to the statute of limitations by implication, or the Survival Act by implication. Two, it's an unambiguous assumption of the liabilities at issue based on the plain language because the language assumes all liabilities subject to statute of limitations. With regard to subsidence claims, the Illinois Supreme Court tells us in West America that the statute of limitation on the subsidence claim begins at the time of the subsidence. And this assumption of liability is certainly subject to that statute of limitations. Or three, there could be a conclusion that the resolution was somehow ambiguous on this issue. Did statute of limitations refer to the Survival Act or not? Is there an ambiguity? Those were the three options. Only if it is determined as a matter of law that it unambiguously was not an assumption of liabilities. It was dismissal of the assumption of liabilities claims appropriately from the trial court. Could CNN's resolution have said we're not accepting any liabilities? Absolutely. Had they done that, would you have any case? If the resolution had said we are, had either been silent or said we are not assuming liabilities of Superior Court, there would be no assumption of liabilities claim, viable claim. We're before you on the assumption of liabilities claim because it plainly said we assume any liabilities subject to statute of limitations. Why did they put that in? Well, the why question, we don't know the answer to yet. Well, but doesn't the why question serve to inform the interpretation of what it means? Was it put in there as part of the goodness of their heart because who knows down the road we have to just protect the citizens of Macoupin County?  CNN might have been a good corporate citizen and all that. We know that in December of 1956 they transferred 150 million tons of coal. Whether they did that, whether they assumed liabilities related to that transfer for tax reasons, we don't know yet. Whether they assumed that liability because they had already testified as we know from earlier cases that there was an alter ego relationship between the companies, we don't know yet. We do know why they didn't assume the liabilities. They certainly didn't do it as part of Superior Coal's dissolution process as Union Pacific would tell you. Because there's nothing within the statute that required the parent corporation to assume anything. The statute only requires Superior Coal to certify upon dissolution that the claims and debts were provided for. This is the parent passing the resolution. The answer to why may come out in discovery. If it does, that will give us the essential motive for the resolution. That may provide us evidence as to the meaning if it's found to be ambiguous. For now, there's been no discovery. We don't know the reason why. We can only surmise several different options. When you remember the cases though, your honors, that Statute of Limitations and Survival Acts are separate and distinct. The cases are legion on that. We're reminded by the Illinois Supreme Court in Earth Foods last year that when you have separate things, and that case dealt with the issue of whether the Illinois Sureties Act could be construed as applying to guarantors. And the court held sureties and guarantors are separate and distinct. They're different things. Therefore, quote, to include guarantors under the plain language chosen by the legislature, to use only the word surety, is an error. That's the case here. Because the courts tell us Statutes of Limitation and Survival Acts are different, separate, and distinct. You cannot read by implication as a matter of law that when the Board of Directors of Chicago Northwestern said in 1956 that it was assuming these liabilities subject to the Statute of Limitations, that it included the Survival Acts. Because that requires you to read into the resolution a term separate and distinct from what's already there, and Earth Foods tells us we can't. In sum, on the assumed liabilities claim, the trial court committed error in concluding as a matter of law that the September 1956 resolution unambiguously did not assume the liabilities at issue. It is either a clear assumption on any liabilities, that's the language used, or there's an ambiguity on the point. In either event, the trial court committed error and respectively asked for reversal on that issue. The trial court also dismissed the related entities, alter ego, and direct participation claims based upon the Illinois Supreme Court's decision in Tankersley v. Peabody Co. The trial court didn't reach the issue of the allegations of those claims because it held that Tankersley precluded liability as to any of those theories. The Tankersley court, by its words, was faced with this issue. Quote, as a matter of first impression, the question of whether a coal mine operator is liable for surface subsidence over areas mined only by its predecessor entitled, where there has been no express assumption of liability and the predecessor is a wholly unrelated business entity. The court decided the case by balancing both the rule of absolute liability and subsidence against encouraging the purchase and sale of coal mining assets. And when it did, it reached this holding and conclusion. Quote, a coal mine company which is producing coal and mine workings of another unrelated company without expressly assuming such liabilities is not liable for subsidence or sinking of land areas due to the mining of its predecessor entitled. In that case, Peabody Co. was a completely unrelated entity from its predecessor entitled. Therefore, under Tankersley, it was not liable. The trial court seized upon that, relied upon that holding, and concluded that well, here, Union Pacific is certainly unrelated to Superior Coal and Union Pacific didn't mine anything. Therefore, under Tankersley, Union Pacific can't be held liable under these theories. But the trial court completely missed the point and misconstrued the law because it's not Union Pacific's conduct that drives the analysis. But Chicago and Northwestern's. Remember the overarching rule of law we talked about at the very outset. If Chicago and Northwestern is responsible for the mining activities, whether it be for alter ego, related entity transfer, assumption of liabilities, Union Pacific is responsible for them as well as a matter of law due to its 1995 merger. Recognizing that it's Chicago and Northwestern's conduct that triggers the liability rather than Union Pacific makes the error of the trial court apparent because with regard to the related entities transfer, the claim that exists in count one, the allegations are replete that Chicago and Northwestern and Superior Coal are extremely related entities. They are in fact allegations that they go all the way to alter ego. Because they are related entities, Tankersley says liabilities follows. That's the exact holding of Tankersley. With regard to the alter ego claim, Tankersley really has no application whatsoever because if two companies are alter egos of one another, they are one and the same. That's the law in this state and every state. Therefore, if Chicago and Northwestern is the alter ego of Superior Coal, it did conduct the mining activities. Tankersley doesn't even apply because there's no transfer of assets. Chicago and Northwestern is the party. The same with direct participation. If Chicago and Northwestern is a direct participant, it conducted the activities and Tankersley rule doesn't apply. But there's even a more base reason that we know that Tankersley doesn't preclude liability for subsidence based upon the relationship between Chicago and Northwestern and Superior Coal. That's simply because this court has already decided the point. In Edwards, this court was faced with the same companies, Superior Coal, Chicago and Northwestern, the same facts regarding their relatedness and alter ego relationship, and the same argument was made by Chicago and Northwestern. Chicago and Northwestern urged this court that under Tankersley, it could not be held liable. Here's what the Edwards court said. In Tankersley, our Supreme Court held that a coal mine operator is not liable for subsidence over areas mined only by its predecessor in title, where there has been no express assumption of liability and the predecessor is a wholly unrelated business entity. Thus the court held that Chicago and Northwestern's reliance upon Tankersley was misplaced because it is readily distinguishable from the present case. Superior Coal, the predecessor in title, is not a wholly unrelated business entity, but a subsidiary corporation. The holding, of course, controls here. Tankersley does not preclude any of the liabilities on any of those three claims and when you look at the facts of those three claims, you will conclude that with regard to related business entities, the complaint alleges close relationship. There was a related business entity transfer in December of 1956. Tankersley provides liability. With regard to direct participation, the Forsyth case held only a few years ago in 2007, that if parent and subsidiary are so close so that parent directly participates, then parent will be liable. The amended complaint paragraphs 12 through 16, subparagraphs A through O, give detailed allegations as to the control, unilateral decisions in mining, operation, and budget made by Chicago and Northwestern or Superior Coal. The direct participation claim is adequately alleged. The alter ego claim has already been decided. It decided it in Edwards. Same facts, same parent, same subsidiary, and this court reversed a dismissal of an alter ego claim, holding that there was a sufficient unity of interest between Chicago and Northwestern and there was a compelling public interest to disregard the corporate shield. Now, in the face of that, Union Pacific tells the court, well, Edwards was about fraud and nobody said anything about fraud here. Well, there was a separate fraud claim in Edwards and the court did deal with that fraud claim at the back end of its opinion, but the primary holding of Edwards was the alter ego claim made related to Chicago and Northwestern and Superior Coal was adequately stated. With that, Union Pacific is left to argue, well, there's a 1941 case where the Supreme Court held that Superior Coal was not the alter ego of Chicago and Northwestern. That was a tax case with a limited holding. Not even Chicago and Northwestern in Edwards believed it could stretch that 1941 opinion that far. Chicago and Northwestern's subsidiary was involved in the 1941 decision. It could have made the argument, it didn't. Your Honor, my red lights are on. I will refer the court to our briefs on the issue of the motion to amend and the remaining issues in the Illinois subsidence funds brief. We'll hear from you on rebuttal. Thank you. Thank you, Judge. I love that. Your Honor, it's Michael Clear. I'm here representing the Union Pacific today. And we do seek the firmness of Judge Mondragon's orders in all respects. We believe he properly dismissed the assumption of liability claim, the alter ego claim, and the direct participation claim. And I think he did it for absolutely sensible, straightforward reasons. And he did it with a full and, frankly, extraordinary understanding of the facts. I have 20 minutes today. He gave us hours on multiple occasions to go through this. I've never met a judge as patient, frankly, I will tell you. In the 40 years I've done this. And he understood what was going on here. And what is going on here is trying to, in fact, impose liability on Union Pacific, which came to this as a stranger 40 years after the events that they want to focus on. And as a result, we say, there is no legal basis to try to hold UP responsible in perpetuity for the subsiding occurrences that may result. Is Mr. Voticchio's argument correct that a merger means that you're now the same entity and the liabilities you had pre-merger continue? Clearly true as to expressly assumed liabilities, Judge. If, in fact, there is a finding that that resolution by C&W back in 19- No, I'm talking about the merger of C&W and Union Pacific. You know, I understand. What I'm saying is that as to if there were express assumption of liabilities by C&W, then I say Union Pacific inherited that when it did the stock acquisition. So the point being, Union Pacific and C&W are the same entity, so the question is back to 1956 then. Well, for purposes that express assumption of liabilities. I think it's a different answer when you get to the Tankersley analysis and whether or not you can, in fact, use alter ego theories to try to stretch it on. Union Pacific, I think, clearly would be responsible for liabilities that were basically visible on the face of what it was acquiring. And that's why we postponed consideration of our Tankersley motion until we could address the new assumption of liabilities point below. Because we said that if they win on that point, we have no Tankersley argument. We accept that. We agree. But if we do not, we think Tankersley says you must look to whether these specific liabilities were assumed. Not the general merger notion, but whether these coal subsidence liabilities were assumed. And as to that, the record's clear. Nobody said a word to Union Pacific in 1995 about coal mine subsidence. There's no claim that there was an express assumption by Union Pacific of those liabilities. That's the distinction we would draw. Well, then the answer to my question is no. I thought that, you know, that's where I began the discussion. I'm not a great business lawyer, but I thought one of the black letter points was if two corporations merge, the existing liabilities continue. And what I say is I think Tankersley, in fact, speaks to that as a matter of Illinois public policy. Saying what? Saying that unless these specific liabilities were assumed, you cannot, in fact, go years later and, in fact, impose that liability against a subsequent acquirer. That's our position on Tankersley. On Tankersley? Yes, yes, sir. Okay, go ahead. I understand your point, and that's why we did address assumed liabilities first. And I'm not going to go into it. Well, I'm not going to read you the 215 statutes of limitations, which the bar thinks are statutes of limitations. But the notion that there is some wall of separation between something that some forms of statutes of limitations, I'm going to say is just legal nonsense. Statutes of limitations are understood, we look at the dictionary, to be a statute that limits claims. Section 94 and its successors are statutes which limit claims. Illinois courts have repeatedly referred to Section 94 and its successor as limiting claims. In fact, the Petone case that we cite to you refers to it as a statute of limitations. The Illinois bar died, it's number four of its 215. I understand they used to give this away to every new member of the bar. What's the statute of limitations with regard to subsidence claims? It is, I believe, I actually have never looked at that question. I think it's five years from the date of the subsidence under subsidence law itself. I'm actually more of a corporate governance authority than a subsidence authority. So it would be five years from the subsidence event? Yes, sir, I think that's right. In this particular case, the subsidence event occurred sometime rather later. Indeed, if that's the relevant statute of limitations for purposes of the resolution, then yes, you're right. If Section 94 is the relevant statute of limitations for purposes of the resolution, then it is two years. That's the crux of the dispute, absolutely. I don't believe there's any argument that's ever been made that under conventional statute of limitations, the claim was filed too late to be able to invoke mine subsidence liability. The issue is whether, in terms of expressed assumption of liabilities, whether the two-year or five-year statute would apply. What does the language mean? It means any and all statutes that limit claims. And I was struck, Kay's merchandise case actually invokes the Holmes poetic phrase about how one construes the words in an agreement. This was a dissolution process. And the plaintiffs, in what they've called their first amended complaint, which is actually the fourth effort at this, attached, and this is double-sided copy. My people took pity on my back. I actually wanted to show and tell measure. They have the whole thing before you. They have all the dissolution papers, the certificates, the shareholder certificates, the shareholder consents, the minutes, the formal dissolution certificate issued by the Secretary of State. These were all the things that were done in 1956 and 57, and they are expressly pleaded on the face of the plaintiff's complaint. We say, as a result, it was clear the C&W understood it was following the strict rules set out in the dissolution statute. And the reason they assumed the liabilities in this fashion is because the dissolution statute says they had to make provision for superior debts for two years following the certificate of dissolution. That was a requirement of the law. And so what the C&W did was it assumed the liabilities subject to the statute of limitations, which was two years, and they, in fact, there's no dispute, there's no allegation that C&W reneged on any of its obligations to satisfy C&W's superior obligations during that two-year period. Just a couple of guys walking down the street, and you're explaining this to them or talking to them about it. One fellow might say, well, wasn't that mining company really just a legal fiction, understanding corporate law, and that the railroad was, I mean, it was their mine. And, gee, if it was their mine, then that stack of papers is impressive, but, gosh, isn't the railroad still on the hook? And the answer, of course, is no. Our law recognizes the legitimacy of separate incorporation. Well, what about the alter ego argument? The alter ego argument is that they've alleged none of the things that Illinois cases say they must allege in order to be able to get over the hurdle of being able to go to trial on the issue. One of the seminal cases under Illinois alter ego law is the Superior Coal decision back in 1941. Two years later, it was followed by a case whose name I love, Five Cent Cab, which was a decision by the Illinois Supreme Court that was actually cited extensively in the Edwards decision. Five Cent Cab and Superior Coal were then cited and relied upon in Maine Bank against Baker, the 1981 case that we also cite to you in our briefs. These are the three seminal cases, we say, that establish the criteria for when is it really just a dummy or a shell, and when is it real? And the elements are very well understood. Reality depends on such things as whether they, in fact, held themselves out as a separate company. Whether they, in fact, commingled funds or not. Whether they maintained their own accounts, bank accounts and so forth. Whether they entered into contracts with third parties and paid their debts. Whether or not it was operated as a fraud is then an independent, separate issue under that alter ego analysis. But your honors, these are not, we're not writing on a clean slate here. I mean, these are the criteria that are very well recognized. And the fact is, they pledged none of the things they would have to plead in order to establish that Superior Coal had no real existence. And what the law does not permit, frankly, is that sort of common sense, man on the street view. Well, by God, they were trying to escape tort liability, and so it's just not fair. You know, that issue has come up actually over and over again. It was expressly addressed in that five cent cab case in 1943 by the Illinois Supreme Court. And cab companies frequently do that. And they do it to avoid tort liability. And that issue was squarely addressed by the Illinois Supreme Court. And what the court said is, that's the reason they have the right to create separate corporations. If they follow the rules, if that separate corporation has its own money, pays its own bills, contracts with its own suppliers. Why isn't this a question of fact? Because the question is whether they've pled those necessary elements in their complaint. Now, they had a problem, because the only thing they know about Superior Coal is what they read about in the Superior Coal 1941 decision. Everything they've pled about the coal company, they got from that 1941 proceeding. You know, no one's actually still around talking about how Superior Coal mined coal until 1953. They just aren't. But what our plaintiffs here did was they tried to crib from the 1941 record that the only things they could come up with were the things the court said didn't matter. And what they couldn't plead, because they're not going to lie to you, they couldn't plead the key elements that the court there said you need to focus on. And that is solvency, capitalization, intermingling of funds, the way in which the company transacted business, adherence to corporate formalities. Superior Coal followed the rules. Superior Coal held shareholder meetings. Superior Coal issued shares. Superior Coal had its bank account. Why do I know that? Found by the Illinois Supreme Court in 1941. The opinion that was then followed in 1954. And frankly, if the facts had all changed, you would think somebody would have mentioned it to the court in 1954, and there is no indication that any facts had changed. So we know that basically throughout the whole history of this, both facts as found by the Supreme Court in 1941 prevailed, which was Superior Coal followed the rules. And as a result, they cannot, in fact, advance an alter ego claim. They can't use the facts the court said are meaningless as their basis to try to get to alter ego. But they say Edwards decided the contrary. They've even said today it's the same facts that were alleged. Well, what do they cite for that? Nothing, in fact. There are no factual recitations in the Edwards decision itself. The only portion of the record in Edwards that's in this record are actually two pages that we inserted in one of the various motions to dismiss. That's at the appendix 1288 and 1289 and 90. That's where the plaintiffs in Edwards summarized what their case was about. And you will see in that not one mention of any of these alter ego factors. Not one mention. There is no discussion, of course, in your decision in Edwards of any of these typical alter ego considerations. No mention of superiors, bank accounts, funding, the way it conducted business, the way it was held out to the public. No. What is discussed in the Edwards decision is that CMW itself is alleged to have committed fraud in how it lulled the plaintiffs into delaying filing their action until after the deadline, the statute of limitations of two years had run. That was the allegation that the court highlighted in its opinion. I've gone back and I've looked at the complaints. That's what the plaintiffs highlighted in their original Edwards complaints. And that's what their brief, which is in the record before you, say the case is about. You will find nothing, nothing to suggest that the Edwards court had before it any of these analysis of the factors that govern alter ego claims. What the court said is, frankly, unity was sufficiently played as a conclusionary measure because the fraud was so patent. And frankly, your honors, I'm sure you've seen cases where parties in fact engaged in fraudulent settlement negotiations to try to cause a party to blow a statute of limitations. And my experience is that they don't get away with it. Whatever the theory, and there are multiple theories that you see, that just doesn't wash. And that's what C&W was accused of doing back in 1959. And don't be confused, by the way. It was decided in 67, but the claims were filed in November of 1959. Edwards in no sense prejudges the alter ego issues that are before you today. Absolutely not. And I say it doesn't prejudge Tankersley either. Mr. Peticchio read to you a portion of the Edwards holding, which he told you was the holding as to Tankersley. But what he did not read is the last sentence of that paragraph. The last sentence of that paragraph said, then too the Superior Coal Company allegedly conducted active mining operations until the time of its dissolution and the transfer of its assets, narrowing the period between the discontinuance of mining and the surface subsidence. Edwards involved apparently a three-month interval, not 30 years. And the Edwards decision expressly recognized that that was a basis to distinguish the facts from Tankersley. Now, I don't know, frankly, and since it's not before you, I don't think I need to know, whether or not that would still apply if this were just C&W before you. But as I've said to you, our position is that because it's Union Pacific, which had absolutely nothing to do with all of these events, Tankersley says you must look to whether there was an express assumption of liabilities, of the mining subsidence liabilities, and we say there was not. I don't really know how much more time I have, but I will tell you that I think that the law is so clear on alter ego and direct participation as to what the elements are of the claim, that while Judge Londrigan did not feel it necessary to get to those points in deciding the case below, we think it is right for decision here, even if you should disagree with him, as to whether Tankersley applies across the board. Because it is just very clear, we submit, that they have not pleaded the elements of alter ego liability in terms of any sham existence of superior coal, and certainly no claim of any fraud. What they tell you in their final briefs are that basically because they both serve laudable purposes, one provides education for children, and the other protects the FISC by trying to recoup monies paid out of a state insurance fund, They say that because those are good goals, that that provides that last element of alter ego analysis. And of course they cite no authority that would suggest that could possibly be true, and frankly I can't imagine any plaintiff couldn't come up with something to suggest to you that they are sympathetic, that they would use the money for good causes, that in fact they are trying to recover for a good reason. The Sealand decision, Judge Bower's decision in Sealand, actually dissected the whole history of Illinois alter ego case law on this, because that was the claim made there, that they were trying to escape liability, and that's a bad goal, and that's enough to satisfy the Illinois test. And he said that's just absolutely wrong. That Illinois is among the strictest states in the Union, in terms of requiring genuine fraud misconduct. Some injury inflicted on a third party by the way that company was created and operated as a basis to pierce the veil and disregard separate corporate identity. And there is not remotely an allegation that superior coal was used that way. Not remotely. There are no allegations that anybody was confused as to who they were dealing with. There is no allegation that in fact the monies were misused and misapplied. Now, superior coal was a bona fide company, and in fact for most of its life was in much better financial shape than its parent. You've seen some of that history from the 1941 decision. What about the fact that it's claimed that superior coal wasn't permitted to sell coal to anyone else? It's not true. They sold coal to other people. The Supreme Court found that. They in fact wanted it, but they sold coal to their employees in the area, and in terms of not being permitted to, well, the CNW was basically buying the complete output of the mine for a good customer. I've had clients who had good customers who in fact were going to buy everything you could make. That in no way is evidence that the company lacked reality. Yeah, but one of the good customers is the parent corporation. Doesn't that put it in a different? No case so holds, Judge. No case so holds. There's nothing illegitimate about trying to create a company that's going to provide a steady source of supply. Does there need to be, for the alter ego, a finding to occur, a suggestion that there has to be something shady or underhanded about it? Yes. Which case so states that? Five cent cab? So states. Main bank? So states. The summary of dozens of cases contained in the Seventh Circuit sealant decision? So states. I mean, as Judge Bower said, there's always an inability to pay that's triggering this claim in the first place. Why would you go to the bother if you had a solvent-ready defender? So you always are looking for some way to get beyond the original party who's unable to pay, whether by dissolution or for other reasons. And so that doesn't in any way satisfy Illinois law's requirements. Thank you. Do you refer to five cent cab in your brief? I do not. I refer to Edwards and quote the Edwards quote of five cent. No, it's your Honor. Edwards talks about it. Edwards. Okay. Well, I'll show you my books. We frankly didn't want to cite to you every case on Earth. Okay. Citing our own is okay. That's fine. Thank you, Counselor. Reball? Thank you, Your Honor. Justice Stegman is right. It is black-letter law in this state that the surviving company in a merger here at Union Pacific is, quote, responsible and liable for all liabilities and obligations, close quote, of its merger partner. That's in our statutes. That's in the Code of Behavior, 305 ILCS 5-11.50A5. It's in our brief. That's born book, black-letter law, and it simply doesn't matter. I wrote down Mr. Clair's words that no one said anything to Union Pacific, not a word, about subsidence liability. That doesn't matter. When they merged in 1995, they took whatever liabilities Chicago and Northwestern had. They could have made it an asset purchase. They didn't. They had their reasons for doing the transaction that way. They took the liabilities. That's the law not only in this state. It's the law in every state. It doesn't matter that no one said anything to Union Pacific about subsidence liability. Alter ego allegations. Appendix pages 12 through 18, it's paragraphs 12 through 19 of the brief. That's a little deceiving because of the amended complaint. It's a little deceiving because paragraph 16 has subparagraphs A through O. There are a boatload of alter ego allegations. And for Mr. Clair to answer a question, well, what about they were only selling coal to the parent? Mr. Clair's response to that was, not true. He doesn't have that luxury. This was a motion to dismiss 2615. The allegation is made. It must be accepted as true. Union Pacific does not have the luxury today to contest the facts and the veracity of the facts in the amended complaint. I can stand here for two hours and tell you about Tankersley and why it supports the claim, and I can tell you for two hours why Edwards already decided many of the issues in this case, and then Mr. Clair will tie it to equal time. What's the point of any of that? I know you'll read the cases. I leave it to you. And when you read them, I have all the confidence in the world. What about Mr. Clair's last point on the alter ego argument, that there has to be an element of sham, fraud, or something of that present in order for the alter ego analysis to apply? And if he's correct, what element is there present here? How is that manifested here? Mr. Clair said to you that we provide no authority for the proposition. Said it in the brief, said it today. The VMN Industries case cited in our opening brief, cited in the reply brief, holds that when determining whether that public interest, compelling public interest, second prong of alter ego is satisfied, courts are permitted to look at, quote, the people affected. And that's why in this case it's critical that the people affected, the school district. He didn't answer my question. What about his argument that there is a sham or fraud aspect of alter ego that has to be shown? Is that true? No, it's not true. That's the second prong of the test. There needs to be a unity of interest and a compelling public interest. Unity of interest between the companies, and then the second prong is compelling public interest. Compelling public interest can be shown either by fraud or something like that, or as the VMN Industries case tells us, by looking at the people affected. That's the prong, and the Edwards Court already decided this issue. We're looking at the people affected. I mean, what kind of a standard is that? Why isn't this point the sound one? You're always going to have some people are going to be adversely affected. And this is a court that hears lots of constructive, clever loitering all the time, and it would be surprising to me if you didn't have a case where some good argument from your AG, some poor little old lady was adversely affected. Is that the standard? No, I think this court is perfectly well-equipped under the VMN Industries case to decide what types of people we're talking about. And we've cited you case after case for the proposition that providing public education is an important element, an important duty in this case. So if this had been a Walmart subsidence matter, they'd be out of luck. But because it's a school, it's a privilege. The alter ego claim would be different, could be different, although Edwards already decided the case. What do you mean? I think we only need to look at Union Pacific's own side of the story. Professor Murdoch, in his treatise, here's what he said. Union Pacific's authority. Edwards held, quote, that to recognize the separate corporate existence of the subsidiary superior code would promote injustice. Close quote. That's the second prong. That's in the respected Illinois treatise. It's cited in our brief. What else did Professor Murdoch say on this particular issue? Edwards, quote, upheld liability against the parent corporation on the basis that there was an identity of interest between the two corporations. Close quote. Professor Murdoch, looking at Edwards, as this court will do, saying the issue of alter ego has been decided, at least with regard to Chicago and Northwestern and superior code. That's the claim. I, too, would respectfully request that the trial court's dismissal of the assumption of liabilities claim, the related entities claim, the alter ego claim, the direct participation claim be reversed, and that the decision to not allow further amendments to the school district's complaint also be reversed. Thank you very much for your time. We'll take the matter under advice.